1   Charles S. LiMandri, SBN 110841
     cslimandri@limandri.com
2   Paul M. Jonna, SBN 265389
     pjonna@limandri.com
3   Mark D. Myers, SBN 235719
     mmyers@limandri.com
4   Jeffrey M. Trissell, SBN 292480
     jtrissell@limandri.com
5   Robert E. Weisenburger, SBN 305682
     rweisenburger@limandri.com
6   Milan L. Brandon II, SBN 326953
     mbrandon@limandri.com
7   LiMANDRI & JONNA LLP
    P.O. Box 9120
8   Rancho Santa Fe, CA 92067
    Telephone: (858) 759-9930
9   Facsimile: (858) 759-9938

    Thomas Brejcha, *pro hac vice**
     tbrejcha@thomasmoresociety.org
    Peter Breen, *pro hac vice**
     pbreen@thomasmorsociety.org
    THOMAS MORE SOCIETY
    309 W. Washington St., Ste. 1250
    Chicago, IL 60606
    Tel: (312) 782-1680
    *Application forthcoming

    *Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, an individual, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT, et al.,<br><br>        Defendants. | Case No.: 3:21-cv-01809-LL-MDD<br><br>**Memorandum of Points & Authorities in Support of Plaintiffs' Motion for a Preliminary Injunction**<br><br>Judge:          Hon. Linda Lopez<br>Courtroom:    2B<br>Hearing Date:  June 15, 2022<br><br>PER CHAMBERS RULES, NO ORAL ARGUMENT UNLESS SEPARATELY ORDERED BY THE COURT |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 10

FACTUAL & PROCEDURAL HISTORY ...........................................11

   A.   The Roe and Poe Families ............................................................11

   B.   The COVID-19 Pandemic & Vaccines........................................ 12

   C.   SDUSD Imposes a COVID-19 Vaccine Mandate ....................... 12

   D.   Procedural History ..................................................................... 14

LEGAL STANDARD ........................................................................15

ARGUMENT......................................................................................16

   I.   Likelihood of Success on the Merits ............................................16

       A.   The Mandate Burdens Plaintiffs' Sincere Religious Exercise. ............16

       B.   The Vaccination Mandate Triggers Strict Scrutiny Review In At Least Five Ways.................................................................. 18

          1.   The Vaccination Mandate triggers strict scrutiny because of its Categorical Exemptions ....................................... 18

          2.   The Vaccination Mandate triggers strict scrutiny because of its Discretionary Exemptions................................... 20

          3.   The Vaccination Mandate triggers strict scrutiny because of its Interference with Parental Rights......................... 21

          4.   The Vaccination Mandate triggers strict scrutiny because of its Lack of Facial Neutrality....................................... 22

          5.   The Vaccination Mandate triggers strict scrutiny because of its Hostility and Distrust of Religion......................... 23

1

**TABLE OF CONTENTS—Continued**

2

C.  The Vaccination Mandate Cannot Satisfy Strict Scrutiny Review. ................................................................. 24

D.  The Vaccination Mandate Cannot Satisfy Rational Basis Review. ................................................................. 28

II.  The Other Injunction Factors are Satisfied.................................................31

III.  Request for Denial of a Stay Pending Appeal ............................................. 32

IV.  The Court Should Dispense with a Bond Requirement .............................. 33

CONCLUSION.............................................................................................. 34

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum of Points & Authorities ISO
Plaintiffs' Motion for a Preliminary Injunction

1

# TABLE OF AUTHORITIES

2 **CASES**

3  *Agudath Israel of Am. v. Cuomo* ......................................................................... 25, 31
4      983 F.3d 620 (2d Cir. 2020)

5  *Air Force Officer v. Austin* ..................................................................................... 27, 32
6      No. 5:22-CV-00009-TES, 2022 WL 468799 (M.D. Ga. Feb. 15, 2022)

7  *All. for the Wild Rockies v. Cottrell* ....................................................................... 15, 31
8      632 F.3d 1127 (9th Cir. 2011)

9  *Am. Beverage Ass'n v. City & County of San Francisco* ............................................. 32
10     916 F.3d 749 (9th Cir. 2019)

11 *Arizona Dream Act Coal. v. Brewer* ............................................................. 28, 29, 30
12     757 F.3d 1053 (9th Cir. 2014)

13 *Bible Club v. Placentia-Yorba Linda Sch. Dist.* ........................................................... 34
14     573 F. Supp. 2d 1291 (C.D. Cal. 2008)

15 *Biden v. Missouri* ........................................................................................................ 26
16     142 S. Ct. 647 (2022)

17 *Booth v. Bowser* ..................................................................................................... 17, 23
18     No. 21-CV-01782 (TNM), 2022 WL 823068 (D.D.C. Mar. 18, 2022)

19 *Bowen v. Roy* ............................................................................................................... 20
20     476 U.S. 693 (1986)

21 *Brown v. Entertainment Merchs. Ass'n* ............................................................... 25, 28
22     564 U.S. 786 (2011)

23 *BST Holdings, LLC v. OSHA* ................................................................................... 31
24     17 F.4th 604 (5th Cir. 2021)

25 *Burwell v. Hobby Lobby Stores, Inc.* ........................................................................ 25
26     573 U.S. 682 (2014)

27 *California v. Azar* ...................................................................................................... 32
28     911 F.3d 558 (9th Cir. 2018)

1

## TABLE OF AUTHORITIES—Continued

2

**Cases**

3   *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah* ................. 16, 18, 20, 22, 23

4      508 U.S. 520 (1993)

5   *City of Boerne v. Flores* ............................................................................24

6      521 U.S. 507 (1997)

7   *Dahl v. Bd. of Trustees of W. Michigan Univ.* ....................................18, 21, 25, 26, 32

8      15 F.4th 728 (6th Cir. 2021)

9   *DiMartile v. Cuomo* ................................................................................ 33

10      No. 1:20-CV-0859 (GTS/CFH), 2020 WL 4877239 (N.D.N.Y. Aug. 19, 2020)

11   *Doctor John's, Inc. v. Sioux City* .................................................................. 34

12      305 F. Supp. 2d 1022 (N.D. Iowa 2004)

13   *Doe v. San Diego Unified Sch. Dist.* ........................................................... 33

14      No. 21-CV-1809-CAB-LL, 2021 WL 5396136 (S.D. Cal. Nov. 18, 2021)

15   *Doe v. San Diego Unified Sch. Dist.* ....................................................... 10, 14, 19, 20

16      19 F.4th 1173 (9th Cir. 2021)

17   *Doe v. San Diego Unified Sch. Dist.* .......................................... 10, 11, 15, 20, 23, 24

18      22 F.4th 1099 (9th Cir. 2022)

19   *Doe v. San Diego Unified Sch. Dist.* .............................................................. 10

20      142 S. Ct. 1099 (2022)

21   *Does 1-3 v. Mills* ...................................................................................... 31

22      142 S. Ct. 17 (2021)

23   *Drakes Bay Oyster Co. v. Jewell* ................................................................. 31

24      747 F.3d 1073 (9th Cir. 2014)

25   *E. Bay Sanctuary Covenant v. Biden* ......................................................... 33

26      993 F.3d 640 (9th Cir. 2021)

27   *Employment Div. v. Smith* .............................................................. 16, 20, 21, 23, 24

28      494 U.S. 872 (1990)

5

1

## TABLE OF AUTHORITIES—Continued

2  **Cases**

3  *Espinoza v. Montana Dept. of Revenue* ............................................................... 21, 22

4        140 S. Ct. 2246 (2020)

5  *Friends of the Earth, Inc. v. Brinegar* ........................................................................34

6        518 F.2d 322 (9th Cir. 1975)

7  *Fulton v. City of Philadelphia* ....................................................19, 20, 21, 23, 24, 25, 28

8        141 S. Ct. 1868 (2021)

9  *Garrett v. Murphy*....................................................................................................... 27

10        17 F.4th 419 (3d Cir. 2021)

11  *Girouard v. United States* ........................................................................................... 16

12        328 U.S. 61 (1946)

13  *Griswold v. Connecticut* .............................................................................................. 21

14        381 U.S. 479 (1965)

15  *Holt v. Hobbs* ............................................................................................................... 25

16        574 U.S. 352 (2015)

17  *Huisha-Huisha v. Mayorkas* ...................................................................................... 33

18        No. CV 21-100(EGS), 2021 WL 4206688 (D.D.C. Sept. 16, 2021)

19  *Jones v. Slade* .............................................................................................................. 17

20        23 F.4th 1124 (9th Cir. 2022)

21  *Jorgensen v. Cassiday* ................................................................................................. 33

22        320 F.3d 906 (9th Cir. 2003)

23  *Klein v. Oregon Bureau of Lab. & Indus.*...................................................................24

24        317 Or. App. 138 (2022)

25  *Marlowe v. LeBlanc* ..................................................................................................... 33

26        810 F. App'x 302 (5th Cir. 2020)

27  *Masterpiece Cakeshop Ltd. v. Colorado Civ. Rts. Comm'n* ................................... 23, 29

28        138 S. Ct. 1719 (2018)

# TABLE OF AUTHORITIES—CONTINUED

**CASES**

*Merrifield v. Lockyer* ...................................................... 29
    547 F.3d 978 (9th Cir. 2008)

*Meyer v. Nebraska* ........................................................ 21
    262 U.S. 390 (1923)

*Miller v. Reed* .............................................................. 16
    176 F.3d 1202 (9th Cir. 1999)

*NIFB v. Dep't of Lab.* .................................................... 31
    142 S. Ct. 661 (2022)

*NIFLA v. Becerra* ......................................................... 25
    138 S. Ct. 2361 (2018)

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency* .............. 34
    766 F.2d 1319 (9th Cir. 1985)

*Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary* .............. 21
    268 U.S. 510 (1925).

*Ramirez v. Collier* ........................................................ 25
    142 S. Ct. 1264 (2022)

*Roberts v. Neace* .......................................................... 19
    958 F.3d 409 (6th Cir. 2020).

*Roman Catholic Archbishop of Washington v. Bowser* ................................. 19
    531 F. Supp. 3d 22 (D.D.C. 2021)

*Roman Catholic Diocese of Brooklyn v. Cuomo* ........................ 11, 16, 18, 22, 24, 31, 32
    141 S. Ct. 63 (2020)

*Romer v. Evans* ........................................................... 29
    517 U.S. 620 (1996)

*Sambrano v. United Airlines, Inc.* ....................................... 31
    No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022)

MEMORANDUM OF POINTS & AUTHORITIES ISO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1

## TABLE OF AUTHORITIES—Continued

2   **Cases**

3   *Save Our Sonoran, Inc. v. Flowers* ............................................................ 34
4          408 F.3d 1113 (9th Cir. 2005)

5   *Sherbert v. Verner* ...................................................................................... 17
6          374 U.S. 398 (1963)

7   *South Bay United Pentecostal Church v. Newsom* ......................... 11, 18, 19, 22
8          141 S. Ct. 716 (2021)

9   *Tandon v. Newsom* ........................................................... 11, 18, 19, 23, 26, 32
10         141 S. Ct. 1294 (2021)

11  *Thomas v. Review Board of Indiana* ......................................................... 17
12         450 U.S. 707 (1981)

13  *Trinity Lutheran Church of Columbia, Inc. v. Comer* ...................... 17, 22, 23
14         137 S. Ct. 2012 (2017)

15  *United States v. Jordan* ............................................................................ 27
16         No. 3:18-CR-04496-GPC, 2020 WL 6504958 (S.D. Cal. Nov. 5, 2020)

17  *United States v. Virginia* .......................................................................... 25
18         518 U.S. 515 (1996)

19  *United States v. Windsor* .......................................................................... 29
20         570 U.S. 744 (2013)

21  *Vill. of Willowbrook v. Olech* .................................................................... 29
22         528 U.S. 562 (2000)

23  *Warsoldier v. Woodford* ............................................................................ 18
24         418 F.3d 989 (9th Cir. 2005)

25  *Winter v. Natural Res. Def. Council* .......................................................... 15
26         555 U.S. 7 (2008)

27  *Wisconsin v. Yoder* ................................................................................... 17
28         406 U.S. 205 (1972)

MEMORANDUM OF POINTS & AUTHORITIES ISO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES—CONTINUED

## FEDERAL RULES

Fed. R. App. P. 8(a)(1)(C) ............................................................ 33

Fed. R. Civ. P. 65(c) ..................................................................... 33

## CONSTITUTIONAL PROVISIONS

U.S. Const., amend. I..............................................13, 16, 26, 31, 32, 34

## COURT DOCKETS

*Carson v. Makin* ............................................................................ 22
     No. 20-1088 (argued Dec. 8, 2021)

Letter from Paul M. Jonna, Esq., Counsel for Applicants, to the Hon. Scott
     S. Harris, Clerk of the Supreme Court of the United States, re:
     *Doe v. San Diego Unified School District*, ....................................... 10
     No. 21A217 (Feb. 11, 2022)

*Let Them Choose v. San Diego Unified Sch. Dist.*....................................... 13
     No. 37-2021-43172-CU-WM-CTL (Cal. Super. Ct. Oct. 12, 2021)

# INTRODUCTION

As explained in the introduction to the First Amended Complaint, eleven Ninth Circuit judges have already determined that San Diego Unified School District's ("SDUSD") COVID-19 vaccine mandate is unconstitutional. *See Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173 (9th Cir. 2021) (Ikuta, J., dissenting from denial of injunction pending appeal) ("*Doe I*"); *Doe v. San Diego Unified Sch. Dist.*, 22 F.4th 1099 (9th Cir. 2022) (Bumatay, J., dissenting from denial of reconsideration en banc) ("*Doe II*"). The mandate only applies to a fraction of the on-campus population; it has exemptions for age, administrative convenience, medical condition, status as a teacher, Superintendent discretion, and many others. It is the antithesis of a generally applicable regime. *See Doe I*, 19 F.4th at 1184-86 (Ikuta, J., dissenting); *Doe II*, 22 F.4th at 1104-08 (Bumatay, J., dissenting); *id*. at 1114-15 (Bress, J., dissenting); *id*. at 1115 (Forrest, J., dissenting). It is also the antithesis of a neutral mandate—explicitly targeting religious students for worse treatment. *See Doe II*, 22 F.4th at 1103-04 (Bumatay, J., dissenting).

With over a third of the Ninth Circuit clamoring for the Supreme Court to reverse a clear error, SDUSD equivocated, informing the High Court that it might pull the plug on its mandate, modify it, or delay it. (FAC Ex. 28.)[1] This gambit worked. On Thursday, February 18, 2022, the Supreme Court denied Plaintiffs here emergency injunctive relief, but "without prejudice to applicants seeking a new injunction" if the mandate continued to contain the same constitutional infirmities. *See Doe v. San Diego Unified Sch. Dist.*, 142 S. Ct. 1099, 1100 (2022) ("*Doe III*"). SDUSD did not get the message, and on Monday, February 22, 2022, SDUSD's Board of Education discussed re-imposing a virtually identical mandate, with only a few minor tweaks, simply delayed from the Spring semester to the Summer semester.

---

[1] *See also* Letter from Paul M. Jonna, Esq., Counsel for Applicants, to the Hon. Scott S. Harris, Clerk of the Supreme Court of the United States, re: *Doe v. San Diego Unified School District*, No. 21A217 (Feb. 11, 2022), https://bit.ly/3gR5Pxz.

1   (FAC ¶ 55 & Ex. 30.) In other words, SDUSD pulled its mandate just before the
2   Supreme Court was set to strike it down, and then reinstated it the week after.

3       In *Diocese of Brooklyn*, *South Bay United Pentecostal Church*, and *Tandon*, the
4   Supreme Court made clear that COVID-19 can never be used as an excuse to trample
5   on religious rights. This means that if exemptions to COVID-19 rules are made for
6   secular purposes, equal or greater exemptions must be made for religious purposes.
7   This is a simple rule, and following five rebukes of the Ninth Circuit, California and
8   Governor Newsom finally chose to follow it. As Judge Bumatay noted in dissent,
9   "[w]ith this case, our court is gunning for a sixth." *Doe II*, 22 F.4th at 1100. This
10  Court should not let that happen.

11      SDUSD's COVID-19 vaccine mandate is unconstitutional, both facially and as
12  applied, and is causing real harm to real students—including Plaintiffs Terry Roe,
13  Taylor Roe, and Adrian Poe—with no justification for why their religious beliefs
14  cannot be accommodated. Plaintiffs Terry Roe, Taylor Roe, and Adrian Poe, and
15  their parents Plaintiffs Tiffany Roe and Andrew Poe, thus now move this Court for a
16  preliminary injunction preventing Defendants from enforcing their COVID-19
17  vaccine mandate against the children.

18                **FACTUAL & PROCEDURAL HISTORY**
19  **A.    The Roe and Poe Families**

20      Terry, Taylor and Adrian are three minors attending high school within the
21  San Diego Unified School District. (FAC ¶¶ 33-38.) Terry and Taylor Roe are
22  siblings attending high school together. Terry is 16, but Taylor is only 15. Taylor will
23  not turn 16 until sometime during the Fall 2022 semester and before the Spring 2023
24  semester. Both Terry and Taylor participate in and enjoy their high school's
25  extracurricular performing arts programs. They are represented in this action by their
26  mother, Tiffany Roe. (FAC ¶¶ 33-35; Terry Decl., ¶¶ 2-13; Taylor Decl., ¶¶ 2-10.)

27      Like Terry, Adrian Poe is also 16. Adrian is in sports, not performing arts.
28  Adrian's father, Andrew Poe, is representing Adrian in this action. (FAC ¶¶ 36-38.)

1  Terry, Taylor, and Adrian are all excited to attend school in the fall, in-person, and to

2  participate in their school's extracurricular activities. (Terry Decl., ¶¶ 11-12; Taylor

3  Decl., ¶¶ 9-10; Adrian Decl., ¶¶ 8-10.) Terry, Taylor, and Adrian are also all devout

4  Christians with strong pro-life and anti-abortion views. (FAC ¶ 27; Terry Decl.,

5  ¶¶ 2-5; Taylor Decl., ¶¶ 2-4; Adrian Decl., ¶¶ 2-7.) All three have already contracted

6  and recovered from COVID-19, developed natural immunity, and were therefore

7  happy to put the threat of COVID-19 behind them. (FAC ¶¶ 28, 35, 38; Terry Decl.,

8  ¶¶ 6-7; Taylor Decl., ¶¶ 5-6; Adrian Decl., ¶ 11.)

9  **B.    The COVID-19 Pandemic & Vaccines**

10        In response to the SARS-CoV-2 virus, the U.S. Food and Drug Administration

11  has approved three COVID-19 vaccines, produced by Pfizer-BioNTech, Moderna,

12  and Johnson & Johnson. The Pfizer vaccine was approved for emergency use with

13  individuals age 16 and up, but the Moderna and Johnson & Johnson vaccines were

14  only approved for individuals age 18 and up. (FAC ¶ 39 & Exs. 1-3.)

15        Subsequently, emergency use of the Pfizer vaccine was expanded to include

16  children age 12 and up, and full approval was granted for the Pfizer vaccine for

17  individuals age 16 and up. The Moderna and Johnson & Johnson vaccines remain

18  available solely for adults on an emergency basis. (FAC ¶ 40 & Exs. 1-4.) Pfizer boosters

19  have also been approved, with a single dose available for children age 12 and up, and

20  two boosters available for individuals age 50 and up. (FAC ¶ 40 & Ex. 1.) All three of

21  these vaccines have been manufactured or tested using material derived from stem cell

22  lines from aborted fetuses, tainting them as unavailable to many people of devout faith

23  with religious objections to abortion. (FAC ¶ 41 & Ex. 5; Bhattacharya Decl., § I.)

24  **C.    SDUSD Imposes a COVID-19 Vaccine Mandate**

25        On Tuesday, September 28, 2021, the Board of Trustees of San Diego Unified

26  School District voted to impose a COVID-19 vaccination requirement for both

27  students and staff—and offered a religious exemption to staff only, not students.

28  (FAC ¶¶ 42-45 & Exs. 6-15.) According to that mandate, students who had turned

age 16 before November 1, 2021 would need to be fully vaccinated in advance of the Spring 2022 semester. (FAC ¶ 43 & Ex. 7.)

When the COVID-19 vaccine mandate was announced, SDUSD then-Board President Barrera stated in interviews that no religious student would be accommodated. (FAC ¶ 7 & Ex. 8.) This was repeated in the text of the mandate itself. (FAC ¶ 43 & Ex. 7 at Slide 15.) But the vaccine mandate oddly was full of holes and exemptions for nearly every other conceivable group. This resulted in immediate lawsuits filed in October 2021, including both the present action based on the Free Exercise clause of the First Amendment (*see* Dkt. 1), and another action in California Superior Court based on state law preemption. *See Let Them Choose v. San Diego Unified Sch. Dist.*, No. 37-2021-43172-CU-WM-CTL (Cal. Super. Ct. Oct. 12, 2021).

Ultimately, however, in early January 2022, SDUSD decided to delay implementing its COVID-19 vaccine mandate. On February 22 and March 8, 2022, the SDUSD Board then voted on setting a new timeline for implementation of the mandate. Beginning with Summer 2022, students who turn age 16 before the first day of school (or the first day of practices if the student participates in extracurricular activities) will need to be vaccinated to attend school or participate in those extracurricular activities. (FAC ¶¶ 51-56 & Exs. 27-33.) The new, closest deadline for students to obtain their first dose of the Pfizer vaccine is **June 28, 2022**. (FAC ¶ 60.)

Substantively, the new COVID-19 vaccine mandate is largely the same as before, with its excessive holes and exemptions—it just has a new implementation timeline. (FAC ¶¶ 57-58.) Just as before, students under age 16 are exempt, representing 87% of all SDUSD students and 56.6% of SDUSD high schoolers (FAC ¶ 58(a)); students who turn age 16 in the middle of a semester are exempt until the start of the next semester (FAC ¶ 58(b)); students and staff can obtain medical exemptions (FAC ¶ 58(c)); staff (but not students) can obtain religious exemptions (FAC ¶ 58(d)); the Superintendent has discretion to impose any exemption he wants, except for a religious exemption (FAC ¶ 58(e)); and many other people without

immunity can also come onto campus (and students can leave campus for field trips), including community members visiting performing arts shows or athletic events, and individuals who are not boosted. (FAC ¶ 58(f).)

The only change in the contours of the COVID-19 vaccine mandate is the withdrawal of certain discretion given to SDUSD staff. Previously, staff could exempt foster youth, homeless youth, migrant youth, and youth from military families if they determined that their individual circumstances made getting vaccinated difficult—or alternatively, that online learning was not feasible for them. (FAC Ex. 7 at Slide 15; FAC Ex. 9 at 22:22-23:1, 28:2-18; FAC Ex. 15 at 3.) Now, such students are treated no differently than other students who move into the District, and must show proof of vaccination on the same timeline. (FAC Ex. 29.1 at 5:20-24; FAC Ex. 30 at Slide 11; FAC Ex. 31 at 4, ¶ 6; FAC Ex. 32 at 11-12; FAC Ex. 33 at 15.) SDUSD previously argued that enrollment of such students was *required* by California statutory law, and so it had no discretion to exclude them on the basis that they were not vaccinated against COVID-19. (*See* Dkt. 15, Opp. to Ex Parte re TRO, § II.C.1; Dkt. 15-4, Barndollar Decl., ¶ 6.) But SDUSD has now apparently reached a different legal conclusion.

### D.  Procedural History

Immediately after initiating this action, Plaintiff Jill Doe, and her parents Plaintiffs John and Jane Doe, applied for a temporary restraining order and an OSC re: preliminary injunction (Dkt. 7, 18), which the Hon. Cathy Ann Bencivengo denied on November 18, 2021. (Dkt. 20.) The Doe Family then appealed and filed a motion for an injunction pending appeal. On November 28, 2021, the Ninth Circuit motion's panel granted the motion in part, but denied it in part. The panel ordered that SDUSD could not extend an exemption to pregnant students while refusing to extend an exemption to religious students. (Dkt. 24.) In response, SDUSD withdrew its pregnancy exemption and the Ninth Circuit then denied the Doe Family's motion in full. (Dkt. 25.) The panel split in both orders, with Circuit Judge Ikuta dissenting and arguing that the Doe Family's motion should be granted in full. (Dkt. 24, 25); *Doe I*, 19 F.4th 1173.

1  The Doe Family then applied to the Ninth Circuit for reconsideration en banc
2  and applied to the Supreme Court for an emergency writ of injunction. On January
3  14, 2022, the Ninth Circuit denied reconsideration en banc, with ten active judges
4  dissenting in three separate dissenting opinions. Judge O'Scannlain also submitted a
5  statement respecting the denial of en banc review. (Dkt. 32); *Doe II*, 22 F.4th 1099.

6  On February 18, 2022, in light of SDUSD's voluntary delay in implementing
7  its COVID-19 vaccine mandate, the Supreme Court denied the Doe Family's
8  application. The Supreme Court stated, "[b]ecause respondent have delayed
9  implementation of the challenged policy, and because they have not settled on the
10  form any policy will now take, emergency relief is not warranted at this time…. The
11  Court's denial is without  prejudice to applicants seeking a new injunction if
12  circumstances warrant." *Doe III*, 142 S. Ct. 1099.

13  Despite eleven Ninth Circuit judges holding that SDUSD's COVID-19 vaccine
14  mandate is unconstitutional, as noted above, on March 8, 2022, SDUSD set a new
15  timeline for its implementation without significant modification. (FAC ¶¶ 54-58.) On
16  April 21, 2022, the Ninth Circuit dismissed the Doe Family's appeal so that renewed
17  proceedings in this Court could occur. (Dkt. 33.) On April 29, 2022, Plaintiffs filed a
18  First Amended Complaint, which added the Roe and Poe Families to the action. (Dkt.
19  34.) Plaintiffs the Roe and Poe Families now move for a preliminary injunction.

20  ## LEGAL STANDARD

21  Plaintiffs seeking a preliminary injunction must establish (1) that they are likely
22  to succeed on the merits, (2) that they are likely to suffer irreparable harm without
23  injunctive relief, (3) that the balance of harms tips in their favor, and (4) that a
24  preliminary injunction is in the public interest. *See All. for the Wild Rockies v. Cottrell*,
25  632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter v. Natural Res. Def. Council*, 555 U.S.
26  7, 20 (2008)). Courts in the Ninth Circuit evaluate these factors through a "sliding
27  scale approach." *Id.* So, for example, "a stronger showing of irreparable harm to
28  plaintiff might offset a lesser showing of likelihood of success on the merits." *Id.*

# ARGUMENT

## I.    LIKELIHOOD OF SUCCESS ON THE MERITS

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof.*" U.S. Const., amend. I (emphasis added). "Throughout the ages men have suffered death rather than subordinate their allegiance to God to the authority of the State. Freedom of religion guaranteed by the First Amendment is the product of that struggle." *Girouard v. United States*, 328 U.S. 61, 68 (1946).

If a law or regulation burdens religious exercise and implicates parental rights, *Employment Div. v. Smith*, 494 U.S. 872, 881 (1990), or is "not neutral or not of general application," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993), then it "must satisfy 'strict scrutiny,' and this means that they must be 'narrowly tailored' to serve a 'compelling' state interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). In contrast, with respect to a rule that is simply "a neutral, generally applicable regulatory law," that does not implicate "other constitutional protections, such as … the right of parents … to direct the education of their children," and "merely [has] the incidental effect" of burdening religion, courts review it solely to determine whether it is "otherwise valid." *Smith*, 494 U.S. at 879-81. In other words, courts review whether the law is "rationally related to [the government's] legitimate interests" or not. *Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999).

As discussed below, SDUSD's COVID-19 vaccine mandate is both subject to, and cannot survive, strict scrutiny. But even under rational basis review, in the unique context of this case, refusing to extend an exemption to Plaintiffs lacks any rational connection to a legitimate government interest.

### A.    The Mandate Burdens Plaintiffs' Sincere Religious Exercise.

No claim under the Free Exercise Clause can be made unless complying with the government regulation burdens the sincere exercise of a religious belief. *See*

*Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972). Establishing this is the religious claimant's burden. *See id.* at 235. In the Free Exercise context, the plaintiff "needs to show a burden, but not a substantial one." *Booth v. Bowser*, No. 21-CV-01782 (TNM), 2022 WL 823068, at *15 (D.D.C. Mar. 18, 2022).

"Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." *Thomas v. Review Board of Indiana*, 450 U.S. 707, 717-18 (1981); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017) ("It is true the Department has not criminalized the way [plaintiff] worships…. But … the Free Exercise Clause protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions."); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."); *Jones v. Slade*, 23 F.4th 1124, 1142 (9th Cir. 2022) (quoting and applying *Thomas*).

Here, the Plaintiffs have met their burden. All three of the COVID-19 vaccines approved by the U.S. Food and Drug Administration have connections to abortion. (FAC ¶ 41 & Ex. 5; Bhattacharya Decl., § I.) Presently, there is an ongoing debate within many religious traditions about the morality of taking these vaccines, with respected authorities coming to different conclusions. (*See* Bhattacharya Decl., ¶ 12.) But Plaintiffs' faith traditions accept the longstanding objection to vaccines that were developed or tested using material derived from abortions. Thus, none of them can receive the vaccines without violating their sincere religious beliefs. (FAC ¶ 27; Terry Decl., ¶¶ 2-5; Taylor Decl., ¶¶ 2-4; Adrian Decl., ¶¶ 2-7.)

Forcing the parents to choose between having their children violate their sincere religious beliefs in order to attend school, or adherence to those beliefs and exclusion from school, is a substantial burden on the free exercise of their religious

beliefs. *See Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728, 732 (6th Cir. 2021) ("Application of these benchmarks leads us to conclude that the University's failure to grant religious exemptions to plaintiffs burdened their free exercise rights. The University put plaintiffs to the choice: get vaccinated or stop fully participating"); *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005) ("sanctions designed to coerce him to comply with that policy constitute a substantial burden on the exercise of his religious beliefs").

### B.   The Vaccination Mandate Triggers Strict Scrutiny Review In At Least Five Ways

#### 1.   The Vaccination Mandate triggers strict scrutiny because of its Categorical Exemptions

SDUSD's vaccine mandate triggers strict scrutiny because the school district has created a series of categorical exemptions from mandatory vaccination. The Supreme Court has long recognized that categorical exemptions from government-created burdens trigger strict scrutiny under the Free Exercise Clause. The *Lukumi* Court called this the problem of "underinclusiv[ity]": "categories of selection are of paramount concern" when a law burdens religious practice. *Lukumi*, 508 U.S. at 542-543. In *Lukumi*, the Supreme Court found the City of Hialeah's rules governing animal killing substantially "underinclusive" and thus not generally applicable with regard to conduct that undermined the government's asserted interests "in a similar or greater degree." *Id.* at 543-44.

Similarly, in *Tandon* and *South Bay United Pentecostal Church*, the Supreme Court recognized that government actions—like selective burdens on home worship— that "treat *any* comparable secular activity more favorably than religious exercise" trigger strict scrutiny under the Free Exercise Clause. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (original italics; bolding added) (citing *Diocese of Brooklyn*, 141 S. Ct. at 67-68). Governmental action is not generally applicable if the government "impose[s] more stringent regulations on religious" activity than secular activity.

*South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021) (Statement of Gorsuch, J.); *see id.* (Barrett, J., concurring).[2] "[W]hether two activities are comparable for purposes of the Free Exercise Clause [is] judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1296. Thus, a law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

Here, SDUSD enrolls more than 121,000 students, and more than 36,000 high school students. (FAC ¶ 58(a) & Exs. 34-35.) But SDUSD only requires approximately 15,700 students to get vaccinated. (FAC ¶ 58(a) & Ex. 30 at Slide 7.) Unlike the few other school districts that mandate COVID-19 vaccination (FAC ¶¶ 46-50 & Exs. 16-26), SDUSD has chosen to exempt thousands of students—and many of its own employees—from its COVID vaccine mandate because of their age, medical condition, secular status, or simply its own administrative convenience. (FAC ¶ 58 & Exs. 30-33.) Each of these exemptions presents "similar risks" to SDUSD's interest in protecting health and safety because each of them results in unvaccinated people present during in-person learning. *Tandon*, 141 S. Ct. at 1296. Such an "exception-riddled policy" is the "antithesis of a neutral and generally applicable policy." *Roberts v. Neace*, 958 F.3d 409, 413-414 (6th Cir. 2020).

In short, because SDUSD's policy "contains myriad exceptions and accommodations for comparable activities," *Tandon*, 141 S. Ct. at 1298—allowing 15,000+ high school students and many employees to attend school in person while unvaccinated—it is not generally applicable and strict scrutiny applies. *See Doe I*, 19

---

[2] The reasoning in Justice Gorsuch's statement was joined by four other Justices, making it a binding opinion. *See Roman Catholic Archbishop of Washington v. Bowser*, 531 F. Supp. 3d 22, 42 n.15 (D.D.C. 2021) (noting that five Justices joined); *id.* at 32 n.5; *see also Tandon*, 141 S. Ct. at 1296-97 (citing Justice Gorsuch's statement as if it were binding authority).

F.4th at 1184-86 (Ikuta, J., dissenting); *Doe II*, 22 F.4th at 1104-08 (Bumatay, J., dissenting); *id.* at 1114-15 (Bress, J., dissenting); *id.* at 1115 (Forrest, J., dissenting).

### 2. The Vaccination Mandate triggers strict scrutiny because of its Discretionary Exemptions

SDUSD's vaccine mandate also triggers strict scrutiny because it contains a system of discretionary exemptions. For several decades, the Supreme Court has recognized that where government imposes a burden on a large category of people but then creates a mechanism for individually exempting some people from the ambit of the burden, the exemption must be extended to religious people as well, unless the government has a compelling reason not to. Relying on *Bowen v. Roy*, 476 U.S. 693 (1986), and *Smith*, the *Lukumi* Court held that "in circumstances in which individualized exemptions from a general requirement are available, the government may not refuse to extend that system to cases of religious hardship without compelling reason." 508 U.S. at 537 (cleaned up).

In *Fulton*, the Supreme Court further explained that where a law "incorporates a system of individual exemptions," or includes "a formal system of entirely discretionary exceptions," strict scrutiny is triggered. 141 S. Ct. at 1878. Importantly, it does not matter whether the system of exceptions has ever been used: "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given[.]" *Id.* at 1879.

Here, SDUSD has created a system that allows Superintendent Jackson discretion to grant exemptions when he sees fit. After instituting a COVID-19 vaccine mandate in October 2021, Superintendent Jackson demonstrated his discretionary authority by unilaterally inserting an exemption for pregnant students without consulting the Board of Education. In response to this litigation, Superintendent Jackson "authorized and directed that the option for pregnant students to request a deferral of the vaccine mandate be removed from the vaccine mandate program and requirements." In doing so, he explained that because the exemption had been

MEMORANDUM OF POINTS & AUTHORITIES ISO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1  initially approved on his own authority, he could rescind it on his own authority, and
2  implied that such discretion will not be used in the future. (FAC, ¶ 58(e) & Ex. 37 at
3  2-3, ¶¶ 2, 3.) But like the unused discretion in *Fulton*, the existence of this discretion
4  makes SDUSD's COVID-19 vaccination policy subject to strict scrutiny. *See Dahl*, 15
5  F.4th at 733 (university's COVID-19 vaccination mandate triggered strict scrutiny
6  due to system of individualized exemptions).

7              **3.     The Vaccination Mandate triggers strict scrutiny because
8                        of its Interference with Parental Rights**

9              SDUSD's vaccination mandate also triggers strict scrutiny under the rule of
10  the *Yoder* line of cases. In *Yoder*, the Supreme Court held that a rule impinging on
11  parents' rights to control "the religious upbringing and education of their minor
12  children" triggered strict scrutiny under the Free Exercise Clause. 406 U.S. at 231.
13  *Yoder* drew on two earlier cases that have been treated as proto-Free Exercise cases
14  because they predated incorporation of the Free Exercise Clause against the states:
15  *Meyer v. Nebraska*, 262 U.S. 390 (1923), and *Pierce v. Society of the Sisters of the Holy*
16  *Names of Jesus & Mary*, 268 U.S. 510 (1925).

17             *Meyer* and *Pierce* were thus formally decided on due process grounds, but both
18  nevertheless later supported *Yoder*'s conclusion that parents have a "fundamental"
19  interest "with respect to the religious upbringing of their children." 406 U.S. at 213-
20  14. *See, e.g.*, *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965) (discussing *Meyer* and
21  *Pierce* as First Amendment cases). *Smith* reaffirmed this line of precedent, describing
22  "the right of parents … to direct the education of their children," recognizing that
23  these claims still receive heightened scrutiny, and citing *Yoder* and *Pierce* for the
24  point. *Smith*, 494 U.S. at 881.

25             More recently, the Supreme Court has repeatedly reaffirmed the unique role of
26  religious education. For example, *Espinoza* reaffirmed as an "'enduring American
27  tradition' … the rights of parents to direct 'the religious upbringing' of their
28  children." *Espinoza v. Montana Dept. of Revenue*, 140 S. Ct. 2246, 2261 (2020)

1    (quoting *Yoder*, 406 U.S. at 213-14). And pending before the Supreme Court is yet
2    another case that concerns the right of parents to direct the religious upbringing of
3    their children. *See Carson v. Makin*, No. 20-1088 (argued Dec. 8, 2021).

4            Here, SDUSD's mandate triggers strict scrutiny under the *Yoder* line of cases
5    because it interferes directly with the ability of the parent-plaintiffs to direct the
6    upbringing of their children. By forcing the parents to have their children
7    vaccinated—a medical procedure both they and their children have sincere religious
8    objections to—SDUSD is directly interfering both with the parents' right to direct
9    the religious upbringing of their children, and with the children's right to have their
10   upbringing controlled by their parents rather than a local government, thus triggering
11   strict scrutiny.

12          **4.    The Vaccination Mandate triggers strict scrutiny because**
13          **of its Lack of Facial Neutrality**

14          "[T]he minimum requirement of neutrality is that a law not discriminate on its
15   face." *Lukumi*, 508 U.S. at 533. "A law lacks facial neutrality if it refers to a religious
16   practice," *id.*, and "single[s] out" religious activity for "harsh treatment." *Diocese of*
17   *Brooklyn*, 141 S. Ct. at 66 & n.1, or "openly impose[s] more stringent regulations on
18   religious" activity than secular activity. *South Bay*, 141 S. Ct. at 717 (Statement of
19   Gorsuch, J.). In other words, government conduct that fails to operate "without
20   regard to religion" and "single[s] out the religious" for disadvantages "clear[ly] …
21   imposes a penalty on the free exercise of religion that triggers the most exacting
22   scrutiny." *Trinity Lutheran*, 137 S. Ct. at 2020-21. Even if the government later
23   attempts to identify a purportedly neutral explanation for reference to religion, strict
24   scrutiny is still required. "Status-based discrimination remains status based even if
25   one of its goals or effects is" a valid goal. *See Espinoza*, 140 S. Ct. at 2256, 2260.

26          Here, SDUSD's vaccine mandate lacks facial neutrality by outright stating that
27   "religious or personal belief exemptions will not be permitted." (FAC ¶ 57 & Ex. 30
28   at Slide 10.) SDUSD's officials have also repeatedly stated in interviews that religious

students will not be accommodated. (FAC ¶ 43 & Ex.8.) In other words, SDUSD's Superintendent has wide discretion to accommodate students for any reason—including pregnancy (*see* § I.B.2, *supra*)—but SDUSD has limited his discretion in one area: religious objections. Thus, by not operating neutrally with respect to religion, the mandate triggers strict scrutiny. *See Doe II*, 22 F.4th at 1103 (Bumatay, J., dissenting) ("the District *expressly* targets the religious for worse treatment in direct violation of Supreme Court precedent."); *Booth v. Bowser*, No. 21-CV-01782 (TNM), 2022 WL 823068, at *15 (D.D.C. Mar. 18, 2022) ("Because the MCA 'refers to a religious practice' and thus is not facially neutral, the Court need not ask whether the law covertly targets religion.").

### 5.    The Vaccination Mandate triggers strict scrutiny because of its Hostility and Distrust of Religion

Government action is also not neutral if it "stem[s] from animosity to religion or distrust of its practices." *Masterpiece Cakeshop Ltd. v. Colorado Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1731 (2018), or when the government acts "in a manner intolerant of religious beliefs." *Fulton*, 141 S. Ct. at 1877. "[T]he protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532; *see also Trinity Lutheran*, 137 S. Ct. at 2021 ("Nor may a law regulate or outlaw conduct because it is religiously motivated."). Any attempt to "impose special disabilities on the basis of religious views" is categorically forbidden. *Smith*, 494 U.S. at 877. Thus, "even slight suspicion" that state action against religious conduct is not neutral triggers strict scrutiny. *Masterpiece Cakeshop*, 138 S. Ct. at 1731. This lack of neutrality is apparent where the government "assume[s] the worst" about religious motivations for accommodation "but assume[s] the best" about secular ones. *Tandon*, 141 S. Ct. at 1297.

Here, SDUSD knew that at least some people of faith would need to be exempted from its COVID-19 vaccine mandate due to their religious beliefs, and used

1  this knowledge to instead specifically disclaim any intention to accommodate them.
2  (FAC ¶ 57 & Ex. 30 at Slide 10.) SDUSD then-Board President Barrera explained
3  that SDUSD would not exempt individuals with religious objections out of a fear that
4  others would abuse the "loophole." (FAC ¶¶ 43, 58(d) & Ex. 15.) Calling a sincere
5  religious belief a "loophole" is more than enough to show hostility to religion. *See*
6  *Klein v. Oregon Bureau of Lab. & Indus.*, 317 Or. App. 138, 161 (2022) (referring to
7  religious objection to same-sex marriage as a "prejudice" was hostility to religion).

8     Further, after imposing its COVID-19 vaccine mandate, SDUSD discovered
9  that only 1.7% of its staff sought religious exemptions, and so the fear of an abused
10 "loophole" was exaggerated. (FAC ¶ 58(d) & Ex. 36.) Yet, SDUSD has still not
11 backed down. When given a choice by the Ninth Circuit to either extend its
12 discretionary exemption for pregnant students to religious students, or extend
13 neither, SDUSD chose to throw pregnant students out. (FAC ¶ 58(e) & Ex. 37.)
14 Presumably recognizing that this reasoning also extended to foster youth, homeless
15 youth, migrant youth, and youth from military families, SDUSD also abandoned
16 them, but retained its administrative convenience exemption. (*See* § C, *supra*.)
17 SDUSD's COVID-19 vaccination mandate did not "incidental[ly]" burden religion,
18 but knowingly did. *Smith*, 494 U.S. at 878. It thus triggers strict scrutiny. *See Doe II*,
19 22 F.4th at 1104 (Bumatay, J., dissenting) ("And contrary to the District president's
20 views, religious exercise isn't a 'loophole,' but a fundamental freedom.").

21     **C.    The Vaccination Mandate Cannot Satisfy Strict Scrutiny Review.**

22     Once strict scrutiny is triggered, the government must show that "denying an
23 exception" to "particular religious claimants," *Fulton*, 141 S. Ct. at 1882, is
24 "'narrowly tailored' to serve a 'compelling' state interest." *Diocese of Brooklyn*, 141
25 S. Ct. at 66. Strict scrutiny is "the most demanding test known to constitutional
26 law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

27     "Once a plaintiff has made out his initial case ..., it is the government that
28 must show its policy 'is the least restrictive means of furthering [a] compelling

1  governmental interest.'" *Ramirez v. Collier*, 142 S. Ct. 1264, 1281 (2022) "This
2  allocation of respective burdens applies in the preliminary injunction context." *Id.* at
3  1277; *see also NIFLA v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (government flunked the
4  narrow-tailoring test in a preliminary injunction motion where it had "identified no
5  evidence" to "prove" tailoring).

6      The government's justification 'must be genuine, not hypothesized or
7  invented post hoc in response to litigation.'" *Agudath Israel of Am. v. Cuomo*, 983
8  F.3d 620, 633 (2d Cir. 2020) (quoting *United States v. Virginia*, 518 U.S. 515, 533
9  (1996)). Even when the government has identified a problem in need of solving, the
10 restriction "must be actually necessary to the solution," for the "government does
11 not have a compelling interest in each marginal percentage point by which its goals
12 are advanced." *Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 799, 803 n.9
13 (2011). "That is a demanding standard." *Id.* And "because [the government] bears
14 the risk of uncertainty, ambiguous proof will not suffice." *Id.* at 799-800 (citations
15 omitted). "[C]onjecture" and "hypothetical[s]," and other "'[s]uch speculation is
16 insufficient to satisfy' [the government's] burden." *Ramirez*, 142 S. Ct. at 1280
17 (quoting *Fulton*, 141 S. Ct. at 1882).

18     The "least-restrictive-means standard is exceptionally demanding" in that it
19 requires the government to show that "it lacks other means of achieving its desired
20 goal." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014). "[S]o long as the
21 government can achieve its interests in a manner that does not burden religion, it
22 must do so." *Fulton*, 141 S. Ct. at 1881. "[A]t a minimum," when other jurisdictions
23 "offer an accommodation, [the government] must … offer persuasive reasons why it
24 believes that it must take a different course." *Holt v. Hobbs*, 574 U.S. 352, 369 (2015).
25 The government must "explore any relevant differences between [its] … process and
26 those of other jurisdictions," and explain why it must diverge. *Ramirez*, 142 S. Ct. at
27 1279; *see also Dahl*, 15 F.4th at 735 (citing the fact that most universities allow
28

religious exemptions to COVID-19 vaccinations to show that university could not satisfy strict scrutiny).

In the COVID-19 context, "narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID. Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied. Otherwise, precautions that suffice for other activities suffice for religious exercise too." *Tandon*, 141 S. Ct. at 1296–97; *see also Dahl*, 15 F.4th at 735 (noting that allowing others to remain unvaccinated defeats strict scrutiny); *Biden v. Missouri*, 142 S. Ct. 647, 650 (2022) (noting that Medicare COVID-19 vaccine mandate properly has religious exemption).

Here, SDUSD's COVID-19 vaccination mandate is not narrowly tailored to further any compelling governmental interest for several reasons:

*First*, SDUSD's vaccination mandate is both underinclusive and overinclusive. The mandate is underinclusive with respect to "mitigating the spread of COVID-19" because SDUSD permits numerous exemptions to its vaccination mandate, allowing thousands of students to be unvaccinated if they are under age 16 for no reason at all, if they are over age 16 for administrative convenience, and allowing medical exemptions for students and staff, and religious exemptions for staff (but not students). (FAC ¶ 58.) It also does not require booster shots despite the compelling evidence that without them, COVID-19 vaccination immunity trails away to nothing. (FAC ¶ 58(f) & Exs. 38-39; French Decl., § E; Bhattacharya Decl., §§ III.B, III.C.)

It is equally underinclusive with respect to a broader interest in student "health and safety." Indeed, under such a broad interest, the mandate is essentially *per se* underinclusive for failing to take a limitless number of actions to protect student health and safety. Most analogously, the COVID-19 mortality rate for *children* is vanishingly small, so small in fact, that the mortality rate for regular influenza is greater. (French

1   Decl., § C; Bhattacharya Decl., § II.) By only mandating vaccination for COVID-19,
2   and not influenza, SDUSD's policies are therefore underinclusive with respect to the
3   goal of promoting student health and safety. (*See also* French, Decl., § A [noting that
4   locking down children has led to a suicide epidemic].)

5     The mandate is overinclusive because SDUSD believes that "COVID-19
6   testing, masking, ventilation, screening, high quality sanitation measures, and
7   requirement for all employees to be vaccinated … are effective at mitigating the
8   spread of COVID-19." (FAC, Ex. 31 at 1.) It is SDUSD's burden to prove that these
9   measures—which it used during the height of the pandemic, and which every other
10  school district uses—are inadequate, but SDUSD actually admits that they are
11  perfectly adequate. (*Id.*) In this respect, it is correct. (Bhattacharya Decl., § IV.)

12    The mandate is also overinclusive because Plaintiffs all have natural immunity,
13  which provides protection that is at least as good as, if not better than, any vaccine.
14  (*See* FAC ¶¶ 28, 35, 38; French Decl., §§ F-G; Bhattacharya Decl., § III); *Air Force*
15  *Officer v. Austin*, No. 5:22-CV-00009-TES, 2022 WL 468799, at *10 (M.D. Ga. Feb.
16  15, 2022) ("Plaintiff's natural immunity coupled with other preventive measures begs
17  the question: Does a COVID-19 vaccine really provide more sufficient protection? …
18  Defendants have failed to explain why having Plaintiff … submit to a COVID-19
19  vaccine is the least restrictive means to achieve its compelling governmental interest in
20  maintaining a healthy force."); *cf. also Garrett v. Murphy*, 17 F.4th 419, 433 & n.7 (3d
21  Cir. 2021) (noting that convict who had recovered from COVID-19 not justify a
22  compassionate release due to natural immunity); *United States v. Jordan*, No. 3:18-CR-
23  04496-GPC, 2020 WL 6504958, at *3 (S.D. Cal. Nov. 5, 2020) (similar).

24    *Second*, SDUSD does not have a "compelling" interest. SDUSD alternatively
25  describes its compelling interest as "mitigating the spread of COVID-19" or
26  "provid[ing] the strongest protection to the health and safety of all students and staff
27  in our schools and community." (FAC, Ex. 31 at 1.) For the former, narrower
28  interest, SDUSD acknowledges that herd immunity is achieved through a vaccination

1  rate of 95% (FAC, Ex. 9, at 34:11), but the only known numbers indicate that only
2  approximately 1.7% of students would seek a religious exemption. (FAC ¶ 58(d) & Ex.
3  36 at 2-4, ¶¶ 2, 6.) There is thus no compelling interest in "denying an exception" to
4  "particular religious claimants." *Fulton*, 141 S. Ct. at 1882. Further, SDUSD's
5  interest in curbing the spread of COVID-19 is not meaningfully served by mandating
6  vaccinations of children generally, or through refusing religious exemptions. Children
7  were never a major source of transmission (French Decl., § B), they themselves are
8  not at risk (French Decl., §§ C-D; Bhattacharya Decl., § II.A), the COVID-19
9  vaccines are no longer effective at preventing transmission (French Decl., § E;
10 Bhattacharya Decl., § III.C), and 75% of children already have natural immunity.
11 (French Decl., § G; Bhattacharya Decl., § III.A.) The science is not "ambiguous,"
12 *Brown*, 564 U.S. at 799-800, it is against SDUSD.

13      For the latter, broader interest—"health and safety" generally—SDUSD fails
14 to take into account known risks of its mandate, including known risks of myocarditis
15 and auto-immune disorders from the mRNA vaccines (French Decl., §§ H-I;
16 Bhattacharya Decl., § V) and the known risk of depression and suicide from locking
17 down children who cannot get vaccinated. (French Decl., § A.) For this latter concern,
18 SDUSD can only argue that its vaccine mandate even furthers "health and safety" by
19 assuming that it will be able to coerce students into violating their religious beliefs, and
20 that they will not actually be relegated into online learning. But such an assumption is
21 legally inappropriate. *See Fulton*, 141 S. Ct. at 1882 (in strict scrutiny analysis, court did
22 not assume that people of faith would succumb to pressure to violate their religious
23 beliefs, but assumed that they would comply with their religious beliefs).

24          **D.    The Vaccination Mandate Cannot Satisfy Rational Basis Review.**
25      In the alternative, SDUSD's vaccination policies also fail rational basis review.
26 "To survive rational basis review, Defendants' disparate treatment of [religious
27 objectors] must be 'rationally related to a legitimate state interest.'" *Arizona Dream*
28 *Act Coal. v. Brewer*, 757 F.3d 1053, 1065 (9th Cir. 2014).

*First*, government policies can fail rational basis review if inspired, not by a legitimate state interest, but by animus. *United States v. Windsor*, 570 U.S. 744, 775 (2013) (finding that "no legitimate purpose" could overcome "the purpose and effect to disparage and to injure"). This can be shown directly, *Arizona Dream Act Coal.*, 757 F.3d at 1067 ("Defendants' policy appears intended to express animus toward DACA recipients themselves"); or where the severe "[over]breadth" of the policy implies animus. *Romer v. Evans*, 517 U.S. 620, 635 (1996). In this sense, a finding that government conduct is not neutral to religion is tantamount to finding that it cannot survive rational basis review. *See Masterpiece Cakeshop*, 138 S. Ct. at 1731 (striking down government conduct on Free Exercise grounds without discussing standard of review applied). Here, for the same reasons discussed above in Sections I.B.4 and I.B.5, there is no legitimate government purpose, solely a desire to coerce people of faith to violate their religious beliefs, and so refusing to accommodate people of faith cannot survive rational basis review.

*Second*, government policies can also fail rational basis review if "the statute is [actually] unrelated to the[ government] interests," *Merrifield v. Lockyer*, 547 F.3d 978, 986 (9th Cir. 2008), such that applying the regulation is "irrational and wholly arbitrary." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000). In sum, "while a government need not provide a perfectly logically solution to regulatory problems, it cannot hope to survive *rational* basis review by resorting to irrationality." *Merrifield*, 547 F.3d at 991.

In *Merrifield*, individuals working in the pest-control industry had to obtain a difficult and expensive "Branch II" license to engage in the removal of "mice, rats or pigeons," even if they only used non-pesticide methods to remove them. *Id.* at 980-81. The government explained that, although Branch II licensure was focused on ensuring pesticide knowledge, applying it to non-pesticide workers served important interests: (1) "the state creates a framework to monitor" all pest-control workers; and (2) even if one does not use pesticides, one should know about its risks and

1  effectiveness in order to protect oneself when entering sites where pesticides were
2  used, and in order to advise customers. *Id*. at 988.

3        However, the government did not require Branch II licensure if the pest-
4  control worker only engaged in non-pesticide removal of "bats, raccoons, skunks, and
5  squirrels." *Id*. at 988-89. Some such pest-control workers had lobbied for a unique
6  licensing category for themselves, arguing that Branch II licensure covered too large a
7  field. But instead of creating a new license, the government decided to not license
8  such workers at all, arguing that since such animals are only removed using non-
9  pesticide methods, licensure was not needed. *Id*. 989-90. The Ninth Circuit noted
10 that this was irrational: that the rationale for *requiring* licensure of non-pesticide mice
11 removal, and the rational for *not requiring* licensure of non-pesticide bat removal,
12 were directly contradictory, and so failed rational basis review. *Id*. at 991.

13        Here, similarly, the rationale behind SDUSD's COVID-19 vaccination
14 mandate requirements and exemptions are directly contradictory. According to
15 SDUSD, its "Expert Panel unanimously recommend[ed] that all persons be safely
16 vaccinated against COVID-19;" it believes that "vaccination of all eligible students
17 who can be safely vaccinated provides the strongest protection to the health and
18 safety of all students and staff in our schools and community;" and thus it approved
19 only "a narrow medical exemption … to protect students who cannot be safely
20 vaccinated." (FAC ¶ 56 & Ex. 31, pp. 1-2.) But this directly undermines the
21 exemptions for administrative convenience, the religious beliefs of staff, students
22 under age 16, and visitors and field trippers. (*See* § C, *supra*.)

23        Further, there is no logical reason why students who cannot get vaccinated for
24 medical reasons should be allowed to participate in class, but students who cannot get
25 vaccinated for religious reasons should not. Both are equally unvaccinated and both
26 are equally able to participate in online learning. *See Arizona Dream Act Coal.*, 757
27 F.3d at 1067 ("Defendants' professed concern applies with equal force to …").
28 SDUSD's "decision to deny a religious exemption in these circumstances doesn't

1  just fail the least restrictive means test, it borders on the irrational." *Does 1-3 v. Mills*,

2  142 S. Ct. 17, 22 (2021) (Gorsuch, J., dissenting).

3  **II.   THE OTHER INJUNCTION FACTORS ARE SATISFIED**

4       The remaining preliminary injunction factors are irreparable harm, balance of

5  harms, and the public interest. *All. for the Wild Rockies*, 632 F.3d at 1131. With respect

6  to irreparable harm, because "[t]he loss of First Amendment freedoms, for even

7  minimal periods of time, unquestionably constitutes irreparable injury," *Diocese of*

8  *Brooklyn*, 141 S. Ct. at 67, "[r]eligious adherents are not required to establish

9  irreparable harm independent of showing a Free Exercise Clause violation." *Agudath*

10 *Israel*, 983 F.3d at 636. When forced to choose between religious beliefs and

11 government benefits, "[p]laintiffs are being subjected to ongoing coercion based on

12 their religious beliefs. That coercion is harmful in and of itself and cannot be

13 remedied after the fact." *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL

14 486610, at *3 (5th Cir. Feb. 17, 2022); *see also BST Holdings, LLC v. OSHA*, 17 F.4th

15 604, 618 n.21 (5th Cir. 2021) (OSHA COVID-19 mandate causes irreparable harm for

16 to the extent it fails to have a religious exemption).

17      Next, when a party seeks a preliminary injunction against the government, the

18 balance of harms and public interest factors merge, because the government's

19 interest is the public interest. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092

20 (9th Cir. 2014). On SDUSD's side, alleged adverse consequences are irrelevant

21 because it is always in the public interest to make sure that the government is

22 complying with the law. *NIFB v. Dep't of Lab.*, 142 S. Ct. 661, 666 (2022) (refusing to

23 weigh allegation that OSHA vaccine mandate "will save over 6,500 lives" because

24 "[i]n our system of government, that is the responsibility of those chosen by the

25 people through the democratic process"); *BST Holdings*, 17 F.4th at 618 ("The

26 public interest is [] served by maintaining our constitutional structure … even, or

27 perhaps *particularly*, when those decisions frustrate government officials.").

28 ///

On Plaintiffs' side, in a case involving Free Exercise rights, where the plaintiffs "have raised serious First Amendment questions," that "compels a finding that the balance of hardships tips sharply in Plaintiffs' favor." *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (cleaned up). This is because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (cleaned up); *see also, e.g., California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) ("Protecting religious liberty and conscience is obviously in the public interest."); *Dahl*, 15 F.4th at 736 ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights").

Thus, in the context of a Free Exercise challenge to a COVID-19 restriction, the remaining three preliminary injunction factors essentially merge into an analysis of whether "the State has [] shown that 'public health would be imperiled' by employing less restrictive measures." *Tandon*, 141 S. Ct. at 1297 (quoting *Diocese of Brooklyn*, 141 S. Ct. at 68). Here, not only would protection for Plaintiffs not harm the public interest, it would *promote* the public interest. SDUSD already permits thousands of students under 16 to attend classes subject to testing, masking, and other mitigation measures; presumably, some of those students attend the same classes as Taylor, Terry, and Adrian. Yet SDUSD has not claimed that these students pose a health threat. Therefore, SDUSD "has not shown that 'public health would be imperiled' by employing less restrictive measures." *Tandon*, 141 S. Ct. at 1297. And it is well accepted in the medical literature that keeping children out of school results in worse health and social outcomes. (French Decl., § A.)

## III.  REQUEST FOR DENIAL OF A STAY PENDING APPEAL

In light of the impending vaccination deadlines that Defendants have imposed, regardless of how this Court rules, Plaintiffs expect that the losing party will immediately appeal, seek relief pending appeal, and seek an expedited appeal. To seek relief pending appeal, however, the moving party is required to seek such relief from this Court before seeking relief from the Ninth Circuit, or is required to seek

1  relief from both courts simultaneously. Fed. R. App. P. 8(a)(1)(C); *see Marlowe v.*
2  *LeBlanc*, 810 F. App'x 302, 304 (5th Cir. 2020); *DiMartile v. Cuomo*, No. 1:20-CV-
3  0859 (GTS/CFH), 2020 WL 4877239, *12 & n.8 (N.D.N.Y. Aug. 19, 2020).

4        In significant part, determining whether to stay an injunction pending appeal,
5  or grant an injunction pending appeal, requires a similar analysis as the underlying
6  motion for a preliminary injunction. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d
7  742, 769 (9th Cir. 2018). However, "[i]n deciding whether the court should stay the
8  grant or denial of a preliminary injunction pending appeal," the court's task is to
9  "predict[] the likelihood of success of the appeal." *E. Bay Sanctuary Covenant v.*
10 *Biden*, 993 F.3d 640, 660 (9th Cir. 2021). In this context, where the district court's
11 analysis of the underlying motion and its prediction of the likelihood of reversal is the
12 same, it is appropriate for the district court to make this clear, so that no motion for
13 relief pending appeal need be presented to it. *See Huisha-Huisha v. Mayorkas*, No. CV
14 21-100(EGS), 2021 WL 4206688, at *18 (D.D.C. Sept. 16, 2021) ("[T]he Court
15 declines to stay this decision pending appeal for substantially the same reasons as
16 those articulated in this Opinion."); *Doe v. San Diego Unified Sch. Dist.,* No. 21-CV-
17 1809-CAB-LL, 2021 WL 5396136, at *6 (S.D. Cal. Nov. 18, 2021) ("For the same
18 reasons, an injunction pending any appeal of this ruling is not warranted.").

19       Thus, at the same time that this Court rules on this motion, Plaintiffs request
20 that the Court rule on whether a stay or injunction pending appeal is appropriate, so
21 that the appealing party is not forced to file contemporaneous motions with both this
22 Court and the Ninth Circuit, and can instead proceed directly to the Ninth Circuit.

23 **IV.  THE COURT SHOULD DISPENSE WITH A BOND REQUIREMENT**

24       Finally, the federal rules provide that a preliminary injunction may be issued
25 "only if the movant gives security in an amount that the court considers proper to
26 pay the costs and damages sustained by any party found to have been wrongfully
27 enjoined or restrained." Fed. R. Civ. P. 65(c). Even so, this Court has discretion over
28 whether any security is required and, if so, the amount. *See, e.g., Jorgensen v.*

*Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). The Ninth Circuit has "long-standing precedent that requiring nominal bonds is perfectly proper in public interest litigation," especially "where requiring security would effectively deny access to judicial review." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) (citing *People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985); *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975)).

Here, Plaintiffs request that the Court waive any bond requirement, because enjoining SDUSD from unconstitutionally enforcing its COVID-19 vaccine mandate in the face of religious objections will not financially affect SDUSD. A bond would, however, be burdensome on already burdened Plaintiffs under these circumstances. *See, e.g.*, *Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1302 n.6 (C.D. Cal. 2008) (waiving requirement of student group to post a bond where case involved "the probable violation of [the club's] First Amendment rights" and minimal damages to the District of issuing injunction); *Doctor John's, Inc. v. Sioux City*, 305 F. Supp. 2d 1022, 1043-44 (N.D. Iowa 2004) ("[R]equiring a bond to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate, because the rights potentially impinged by the governmental entity's actions are of such gravity that protection of those rights should not be contingent upon an ability to pay."). In line with the above cases, recent Free Exercise cases enjoining unconstitutional vaccine mandates have waived the bond requirement. *See Air Force Officer*, 2022 WL 468799, at *13.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant in full their motion for a preliminary injunction, dispense with a bond requirement, and deny any stay of its order pending appeal.

///

///

1

2          Respectfully submitted,

3          LiMANDRI & JONNA LLP

4

5    Dated: May 11, 2022          By:

6          Charles S. LiMandri
          Paul M. Jonna
7          Mark D. Myers
          Jeffrey M. Trissell
8          Robert E. Weisenburger
          Milan L. Brandon II
9          Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28